## No. 13-1985

In The
# United States Court Of Appeals
For The Fourth Circuit

**YAN DONG,**

Plaintiff-Appellant,

**v.**

# BASF CORPORATION and
# JONATHAN ANTONUCCI,

Defendants-Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

### BRIEF OF DEFENDANTS-APPELLEES

Kelly S. Hughes
OGLETREE, DEAKINS, NASH,
  SMOAK & STEWART, P.C.
201 South College Street, Suite 2300
Charlotte, North Carolina 28244
Telephone: (704) 342-2588
Facsimile: (704) 342-4379

*Attorney for Defendants-Appellees*

Theresa Donahue Egler
OGLETREE, DEAKINS, NASH,
  SMOAK & STEWART, P.C.
10 Madison Avenue, Suite 400
Morristown, New Jersey 07960
Telephone: (973) 656-1600
Facsimile: (973) 656-1611

*Attorney for Defendants-Appellees*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No.  __13-1985__        Caption:  Yan Dong v. BASF Corporation _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

Jonathan Antonucci _____
(name of party/amicus)

_____

who is _____ an appellee _____, makes the following disclosure:
     (appellant/appellee/amicus)

1.     Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.     Does party/amicus have any parent corporations?  ☐YES ☑NO
     If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
     If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: s/Kelly S. Hughes _____    Date: _____8/19/2013_____

Counsel for: Jonathan Antonucci _____

## CERTIFICATE OF SERVICE
**************************

I certify that on _____8/19/2013_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Yan Dong
203 Grimball Lane
Fort Mill, SC 29715

s/Kelly S. Hughes _____                8/19/2013 _____
(signature)                                                        (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __13-1985__        Caption: __Yan Dong v. BASF Corporation__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__BASF Corporation__
(name of party/amicus)

_____

who is _____an appellee_____, makes the following disclosure:
        (appellant/appellee/amicus)

1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?                       ☑ YES ☐ NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:
        BASF Americas Corporation.  BASF Corporation is a wholly owned subsidiary of BASF Americas Corporation, which, in turn, is a wholly owned subsidiary of BASFIN Corporation, which, in turn, is a wholly owned subsidiary of BASF Nederland BV, a Dutch corporation, which is a wholly owned subsidiary of BASF Societas Europaea ("BASF SE").  BASF Corporation, BASF Americas Corporation, BASFIN Corporation, and BASF Nederland BV are not publicly held.  The stock of BASF SE is traded publicly in Germany and other countries outside the United States, and its American Depository Receipts are traded in the United States on the over-the-counter market.

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                ☐ YES ☑ NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
      If yes, identify any trustee and the members of any creditors' committee:

Signature: s/Kelly S. Hughes _____    Date: _____8/19/2013_____

Counsel for: BASF Corporation _____

## CERTIFICATE OF SERVICE
**************************

I certify that on _____8/19/2013_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Yan Dong
203 Grimball Lane
Fort Mill, SC 29715

s/Kelly S. Hughes _____          _____8/19/2013_____
        (signature)                                          (date)

# TABLE OF CONTENTS

I.    JURISDICTIONAL STATEMENT ................................................1

II.   STATEMENT OF ISSUES ......................................................1

III.  STATEMENT OF CASE  .......................................................2

IV.   STATEMENT OF FACTS .......................................................6

     A.    BASF, Its EEO Policy, and Its Code of Conduct................................6

     B.    Defendant Jonathan Antonucci and Dr. Cheng-Le Zhao....................8

     C.    Plaintiff, His Initial Hire and His Employment at BASF ...................9

     D.    Plaintiff's Charge of Discrimination and Allegations During
         the Administrative Proceedings ..........................................20

     E.    Plaintiff's Complaint and Deposition Testimony ..............................22

     F.    Luis Varela and Andrea Hamilton .......................................23

V.    SUMMARY OF ARGUMENT...............................................25

     A.    Review of Award of Summary Judgment..........................................25

     B.    Review of Denial of Motion to Extend the Discovery Period
         For a Fourth Time and Denial of Plaintiff's Motions to
         Compel Discovery .......................................................27

VI.   ARGUMENT.................................................................27

     A.    The District Court Properly Found That Plaintiff Cannot
         Establish a *Prima Facie* Case of Discrimination ...............................27

     B.    The District Court Properly Found That Plaintiff Cannot
         Establish that the Company's Legitimate, Non-Discriminatory
         Reason for His Termination Was Pretextual........................................30

C.     The District Court Did Not Disregard *Reeves* ......................................32

D.     The District Court Did Not Disregard *National Railroad Passenger Corporation v. Morgan* ........................................................34

     1.     *Morgan* ..............................................................................35

     2.     Title VII's EEOC Charge Requirements and the Fourth Circuit's Recent Published Opinion in *Balas* ...............36

     3.     The Purported "Chinaman" Comments are Stray Remarks .....41

E.     Plaintiff's "Comparator" Evidence Fails .............................................45

F.     The District Court Did Not Abuse Its Discretion When It Denied Plaintiff's Discovery Motions .............................................49

VII.    CONCLUSION.................................................................................................55

VIII.   STATEMENT REGARDING ORAL ARGUMENT ....................................55

Certificate of Compliance

Certificate of Service

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..................................................................26

*Anderson v. Westinghouse Savannah River Co.*,
406 F.3d 248 (4th Cir. 2005) ...................................................31

*Ardrey v. United Parcel Serv.*,
798 F.2d 679 (4th Cir. 1986) ...................................................49

*Balas v. Huntington Ingalls Industries, Inc.*,
711 F.3d 401 (4th Cir. 2013) .............................................passim

*Balas v. Huntington Ingalls Industries, Inc.*,
Civil Action No. 2:11cv347, 2011 WL 4478864
(E.D.Va. Sept. 26, 2011)..............................................37, 38, 39

*Brown v. Huntington Ingalls Inc.*,
489 F. App'x. 646 (4th Cir. 2012) ............................................54

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)..................................................................26

*Cochran v. Holder*,
436 F. App'x 227 (4th Cir. 2011) .............................................46

*Connolly v. Pepsi Bottling Group, LLC*,
347 F. App'x 757 (3d Cir. 2009) ..............................................43

*DeJarnette v. Corning Inc.*,
133 F.3d 293 (4th Cir. 1998) ...................................................31

*Demesme v. Montgomery Cnty. Gov't*,
63 F. Supp. 2d 678 (D.Md. 1999)............................................34

*Duffy v. Belk*,
477 F. App'x 91 (4th Cir. 2012) ...............................................32

*E.E.O.C. v. Clay Printing Co.*,
  955 F.2d 936 (4th Cir. 1992) ...................................................................31, 42

*Erwin v. United States*,
  591 F.3d 313 (4th Cir. 2010) ...............................................................46

*Evans v. Techs. Applications & Serv. Co.*,
  80 F.3d 955 (4th Cir. 1996) .................................................................31

*Fuentes v. Perskie*,
  32 F.3d 759 (3rd Cir. 1994) ...............................................................42

*Harris v. Rumsfeld*,
  428 F. Supp. 2d 460 (E.D.Va. 2006),
  *appeal dismissed*, 207 F. App'x 343 (4th Cir. 2006) ..........................................31

*Harrods Ltd. v. Sixty Internet Domain Names*,
  302 F.3d 214 (4th Cir. 2002) ...............................................................49

*Hawkins v. PepsiCo., Inc.*,
  203 F.3d 274 (4th Cir. 2000) ...........................................................31, 32

*Hawkspere Shipping Co., Ltd. v. Intamex, S.A.*,
  330 F.3d 225 (4th Cir. 2003) ...............................................................25

*Hill v. Lockheed Martin Logistics Mgmt., Inc.*,
  354 F.3d 277 (4th Cir. 2004) (en banc) ...........................................................28

*Holland v. Washington Homes, Inc.*,
  487 F.3d 208 (4th Cir. 2007) ...........................................................30, 31

*Hospodor v. Burlington Industries, Inc.*,
  205 F.3d 1333 (4th Cir. 2000) ...............................................................36

*In re Hartford*,
  911 F.2d 722 (4th Cir. 1990) ...............................................................3

*King v. Rumsfeld*,
  328 F.3d 145 (4th Cir. 2003) ...........................................................29, 31

*Lloyd v. New Hanover Regional Medical Center*,
  405 F. App'x 703 (4th Cir. 2010) ...............................................................45

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986)........................................................................25

*McDonnell Douglas Corp. v. Green,*
    411 U.S. 792 (1973)........................................................................30

*National Railroad Passenger Corporation v. Morgan,*
    536 U.S. 101 (2002)..........................................................34, 35, 36

*Price v. Thompson,*
    380 F.3d 209 (4th Cir. 2004) ........................................................30

*Reeves v. Sanderson Plumbing Prods., Inc.,*
    530 U.S. 133 (2000)..........................................................30, 31, 33

*Rooks v. Girl Scouts of Chicago,*
    95 F.3d 1154 (7th Cir. 1996) ........................................................34

*Roseboro v. Garrison,*
    528 F.2d 309 (4th Cir. 1975) ..........................................................5

*Smith v. Flax,*
    618 F.2d 1062 (4th Cir. 1980) ......................................................31

*Sook Yoon v. Sebelius,*
    481 F. App'x 848 (4th Cir. 2012) ..................................................31

*St. Mary's Honor Center v. Hicks,*
    509 U.S. 502 (1993)........................................................................34

*U.S. v. Perkins,*
    205 F.3d 1336 (4th Cir. 2000) ........................................................3

*Wells v. Liddy,*
    186 F.3d 505 (4th Cir. 1999) ........................................................27

## STATUTES

28 U.S.C. § 1291 ..............................................................................1

28 U.S.C. § 1331 ..............................................................................1

28 U.S.C. § 1367 ..............................................................................1

42 U.S.C. § 2000e-5(b) .............................................................37

**OTHER AUTHORITIES**

Fed. R. App. P. 34(a)(1) ............................................................55

Fed. R. Civ. P. 56(a) .................................................................25

# I.    JURISDICTIONAL STATEMENT

The District Court had original jurisdiction over Plaintiff's Title VII claim under 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiff's purported state law tort claim under 28 U.S.C. § 1367.[1]  This Court has appellate jurisdiction over the appeal from the final judgment of the District Court under 28 U.S.C. § 1291.  The notice of appeal was filed on August 5, 2013, and entered by the District Court on August 6, 2013.

# II.    STATEMENT OF ISSUES

1.    Whether the District Court correctly held that Plaintiff cannot make out a *prima facie* case of race or national origin discrimination where Defendants supplied competent evidence of Plaintiff's unsatisfactory job performance and Plaintiff simply disagrees with Defendants' assessment of his performance.

2.    Whether the District Court correctly held that Plaintiff cannot show that the Company's legitimate, nondiscriminatory reason for terminating Plaintiff's employment was a pretext for race or national origin discrimination where Plaintiff failed to supply any admissible evidence of discriminatory bias.

3.    Whether the District Court's May 10, 2013 Order, denying Plaintiff's

---

[1] Plaintiff admits here he does not challenge the dismissal of his "tort claim" and "withdraws" that portion of his appeal.  (Appeal Doc. 11 at 8 of 54, n.1.)

1

motion to extend discovery for a fourth time and denying Plaintiff's second and third motions to compel was an abuse of discretion.

## III.   STATEMENT OF CASE

*Pro se* Plaintiff Yan Dong is a former employee of BASF whose employment was terminated for unsatisfactory job performance.  Subsequent to his termination, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against BASF, alleging that his termination was because of his race and national origin (Asian/Chinese) in violation of Title VII of the Civil Rights Act of 1964 ("Title VII").  In support of his Charge, Plaintiff simply disagreed with the judgment of his supervisor, Jonathan Antonucci ("Antonucci"), and Antonucci's supervisor (Dr. Cheng-Le Zhao, also Asian/Chinese), that his performance was deficient and complained that he had not been placed on a Performance Improvement Plan ("PIP").  However, Plaintiff had been counseled by Antonucci regarding his performance and deficiencies.  Moreover, regardless of Plaintiff's personal opinion of his performance, it is the business judgment of his supervisor and management that matter.  With respect to Plaintiff's claim regarding the PIP, it is undisputed that Plaintiff was an "at-will" employee of BASF whose employment was subject to termination at any time for any reason, and BASF has no policy requiring that employees be placed on a PIP prior to termination.  The EEOC issued a no cause finding, dismissing Plaintiff's

Charge.

Plaintiff subsequently brought this lawsuit which asserts a single count of wrongful termination under Title VII, naming as defendants BASF Corporation and Antonucci.[2]   In his Complaint, Plaintiff alleged <u>for the first time</u> that Antonucci used the term "Chinaman," which he claimed demonstrated a discriminatory animus.  After over a year of discovery, including three extensions of the discovery period, during which time Plaintiff filed two (2) motions to compel (DE 17 and DE 38),[3] BASF filed a motion for summary judgment with the District Court on May 3, 2013.  (DE 43.)  BASF's summary judgment motion was supported by the Affidavit of Jonathan Antonucci and attachments thereto ("Antonnuci Aff.") (DE 43-2); the Declaration of Cheng-Le Zhao ("Zhao Decl.") (DE 43-3); select portions of Plaintiff's deposition testimony and deposition exhibits ("Pl. Dep." or "Pl. Dep. Ex.") (DE 43-4, 43-5, 43-6, 43-7, 43-8, 43-9, 43-

---

[2] Plaintiff's appellate brief states – for the first time – that "Dong brought his claims in the Western District of North Carolina, pursuant to 42 U.S.C. §2000e-2, 42 U.S.C. § 1981, and the Common Tort Law…"  (Appeal Doc. 11 at 10 of 54.)  This statement is incorrect.  Plaintiff has not cited 42 U.S.C. § 1981 in his Complaint or ever mentioned 42 U.S.C. § 1981 before the District Court.  Accordingly, he cannot raise this claim for the first time on appeal.  *U.S. v. Perkins,* 205 F.3d 1336 (4th Cir. 2000) (*pro se* plaintiff's claims presented in his informal brief "were not raised before the district court and cannot be raised for the first time on appeal."); *In re Hartford,* 911 F.2d 722 (4th Cir. 1990) (affirming decision below primarily because *pro se* plaintiff's issues "were not raised below [and therefore] may not be raised for the first time on appeal.").

[3] Citations to documents filed with the District Court will be cited as "DE," followed by the docket entry number assigned by the District Court.

3

10 and 43-11); and the Affidavit of Kelly S. Hughes and attachment thereto ("Hughes Aff.") (DE 43-12).

After BASF filed its motion for summary judgment, Plaintiff filed a third motion to compel discovery (DE 46), a motion for reconsideration of the Magistrate Judge's denial on one of his motions to compel (DE 50), a motion to strike the Affidavit of Jonathan Antonucci (DE 52), and a motion to strike the Declaration of Cheng-Le Zhao (DE 55). Plaintiff then filed his summary judgment response on May 31, 2013 (DE 56). In support of his opposition, Plaintiff submitted 110 pages of documentation, including the performance reviews and other performance-related documents for himself and other BASF employees, the affidavit Antonucci filed in support of BASF's response to Plaintiff's April 10, 2013 motion to compel, correspondence from BASF's counsel, communications between himself and a member of BASF's human resources department, BASF training materials, and Defendants' responses to his discovery requests. BASF filed its reply in support of summary judgment on June 10, 2013 (DE 61). In support of its reply brief, BASF submitted the Second Affidavit of Jonathan Antonucci, with exhibits ("Second Antonucci Aff.") (DE 61-2, 62 and 63).

On June 19, 2013, the District Court held oral argument on BASF's summary judgment motion. In light of Plaintiff's *pro se* status, the District Court provided notice to Plaintiff of what was required of him in opposing a summary

judgment motion pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), and permitted Plaintiff to file additional materials for the Court's consideration after the oral argument (DE 68).  On June 24, 2013, Plaintiff filed an "Amended Affidavit" and over 200 pages of exhibits.  (DE 70, 71, 72.)

On July 8, 2013, the District Court issued its Memorandum of Decision and Order ("Order"), granting BASF's motion for summary judgment in its entirety. The District Court first held that Plaintiff did not present admissible evidence that he was performing his job duties at a level that met BASF's expectations, as required to establish a prima facie case of discrimination.  (DE 78 at 9.)  The District Court further held that BASF had established a legitimate, non-discriminatory reason for Plaintiff's termination, i.e., Plaintiff's poor performance. (*Id.*)  Next, with respect to the pretext analysis, the District Court noted that, although Plaintiff alleged in his Complaint that Antonucci used the term "Chinaman," the record was clear that Plaintiff had never mentioned the "Chinaman" comment in his EEOC Charge or in any of his multiple communications with the EEOC.  (*Id.* at 10, 12.)  The District Court concluded that, pursuant to a recent Fourth Circuit decision, Plaintiff could not rely on this belated allegation in support of his claim as it was not a part of his EEOC Charge and exceeded the scope of that Charge.  The District Court further found that, even if the alleged "Chinaman" comment was considered, it was undisputed that

Antonucci's alleged use of this term was remote in time and unrelated to his termination decision. (*Id.* at 11.) Therefore, the District Court concluded that Plaintiff's belated allegation that Antonucci used the term "Chinaman" did not create a genuine issue of fact to defeat summary judgment. Ultimately, the District Court found that Plaintiff failed to present any competent evidence upon which a fact finder could determine that the reason given for Plaintiff's termination was pretextual. Finally, the District Court further held that Antonucci was entitled to summary judgment as a matter of law because no Title VII liability lies against an individual defendant. (*Id.* at 13.)

Plaintiff filed his notice of appeal on August 5, 2013 (DE 80). On appeal, Plaintiff has abandoned any challenge to the District Court's dismissal of Antonucci from this lawsuit or challenge to any "state tort claim." (Appeal Doc. 11 at 8 of 54, n.1.)

## IV.    STATEMENT OF FACTS

### A.    BASF, Its EEO Policy, and Its Code of Conduct

1.    BASF manufactures and markets a broad range of chemicals, polymers, coatings and colorants, consumer goods and agricultural products. The BASF Charlotte Technical Center is a research and development facility where Plaintiff worked. (DE 43-2, Antonucci Aff. ¶¶ 3, 12.)

2.    The BASF Charlotte Technical Center employs a diverse group of

employees of many different races and nationalities in technical and scientific roles.  (*Id.* ¶ 4.)

3.    BASF is firmly committed to Equal Employment Opportunity ("EEO") and to compliance with all federal, state and local laws that prohibit employment discrimination on the basis of race and national origin, among other things.  (DE 43-7, Pl. Dep. Ex. 6.)  The Company maintains a strong EEO Policy which prohibits, among other things, discrimination in employment because of race or national origin.  (DE 43-7, Pl. Dep. Ex. 5.)  This policy applies to all employment decisions, including terminations.  (DE 43-7, Pl. Dep. Ex. 6.)

4.    Individuals who believe they have been subjected to discrimination are directed to report the alleged act to their supervisor.  Alternatively, if the complaint is directed at their supervisor, they are directed to report it to the next level of management or above, or directly to a Human Resources representative for the individual unit.  Employees may also use the confidential Corporate Compliance Hotline.  (DE 43-7, Pl. Dep. Ex. 5.)

5.    The Company's EEO policy is provided to all new employees, conspicuously posted on bulletin boards, and posted on BASF's intranet.  (*Id.*)

6.    BASF also maintains a Code of Conduct.  (DE 43-8, Pl. Dep. Ex. 7.) In its Code of Conduct, BASF reiterates its commitment to equal employment opportunity, diversity and respect in the workplace.  (*See*, e.g., DE 43-8, Pl. Dep.

Ex. 7 at BASF 000112.)

7.     Plaintiff never made a complaint of discrimination during his employment with BASF.  (DE 43-4, Pl. Dep. 59-60.)

**B.     Defendant Jonathan Antonucci and Dr. Cheng-Le Zhao**

8.     Defendant Jonathan Antonucci is currently employed by BASF as a Development Manager at BASF's Charlotte Technical Center.  Antonucci has a Bachelor's degree in chemistry and computer science and a Master's degree in chemical engineering.  (DE 43-2, Antonucci Aff. ¶¶ 1, 5.)

9.     Antonucci has been employed by BASF since August 18, 1997. During his employment, Antonucci has held several positions, including Lab Technician, Chemist, Senior Research Chemist, and Process Development Manager.  (*Id.* ¶¶ 2, 6.)

10.     Effective December 2009, Antonucci was promoted to the ACP Process and Product Development Manager, N-EDN/T and began reporting to Dr. Cheng-Le Zhao, who was then the Technology Director, Pigments and Dispersions North America.  (*Id.* ¶ 7.)

11.     Dr. Zhao, who is of Asian/Chinese origin, is currently living in China and is working for BASF Auxiliary Chemicals Co. Ltd. as Regional Head Asia Pacific, Technology and Development, Dispersions & Pigments Asia Pacific.  Dr. Zhao and Antonucci were co-workers at the BASF Technical Center in Charlotte

for many years before Dr. Zhao became Antonucci's boss. (*Id.* ¶ 8; DE 43-3, Zhao Decl. ¶ 4.)

12.     Antonucci has received extensive training in the Company's EEO policies. (DE 43-2, Antonucci Aff. ¶ 9.)

13.     During his employment with BASF, Antonucci has hired and promoted other Asian/Chinese individuals. For example, Antonucci recommended for hire an individual by the name of Don Cho. Additionally, he recommended for promotion to a delegation in Germany another employee by the name of J.D. Kim. (*Id.* ¶ 10.)

14.     Antonucci has never been the subject of any type of complaint (internal or external), alleging that he engaged in discriminatory treatment of any kind, other than the allegations by Plaintiff in this lawsuit. (*Id.* ¶ 11.)

15.     Additionally, Dr. Zhao, who has known Antonucci for over ten (10) years, has never observed him say or do anything that would demonstrate any kind of racial or national origin bias against Asian and/or Chinese individuals. (DE 43-3, Zhao Decl. ¶ 5.)

## C.     Plaintiff, His Initial Hire and His Employment at BASF

16.     Plaintiff was born in China. (DE 43-4, Pl. Dep. 19.) Plaintiff identifies himself as being of Asian race and of Chinese national origin. (DE 1 ¶ 3.)

9

17.    In or around December 2007, Plaintiff applied to work as a chemist at BASF.  On the employment application he submitted to BASF, he indicated that he was fluent in Chinese.  (DE 43-7, Pl. Dep. Ex. 2 at BASF 000005.)  On his resume, which he submitted to BASF for consideration, he stated that he had worked in China as a Senior Chemist and Senior Research Scientist and that he had attended school in China.  (DE 43-7, Pl. Dep. Ex. 1 at BASF 000009 - BASF 000010; DE 43-4, Pl. Dep. 50-52.)

18.    Plaintiff interviewed in person with "quite a few people" at BASF prior to his hire.  (DE 43-4, Pl. Dep. 40, 48.)

19.    In or around January 2008, BASF extended an offer of employment to Plaintiff to work as a Senior Research Scientist at BASF's Charlotte Technical Center.  (DE 43-2, Antonucci Aff. ¶¶ 12, 13.)[4]  When BASF extended the offer of employment to Plaintiff, it was clear that Plaintiff was Asian/Chinese.  (*Id.* ¶ 12.)

20.    Plaintiff began working for BASF in February 2008.  As a Senior Scientist, he was responsible for conducting developmental research in the area of

---

[4] As he did before the District Court, Plaintiff argues on appeal that he was hired as a Senior Research Scientist Level I, not Level II.  (Appeal Doc. 11 at 11 of 54.)  He argues that his "position level could be a material fact because Defendants claimed that his performance relative to his alleged Level II position was the motivating factor in the termination."  (Appeal Doc. 11 at 49 of 54, citing SA 214-20.)  Plaintiff's "argument" lacks merit.  As the District Court properly noted, "such dispute is not material as all parties agree that plaintiff was a Senior Research Scientist and it is undisputed that BASF perceived plaintiff to be at Level II at the time of his termination."  (DE 78 at 2.)

emulsion polymers (latex), specifically pressure sensitive adhesives for products such as labels and tapes. His duties entailed designing recipes for polymerizations, overseeing the experiments, testing the resulting product analytically for certain traits, reviewing the data for validity, modifying the recipes and determining whether progress was being made toward achieving a commercially viable product. (DE 43-2, Antonucci Aff. ¶ 13.)

21.    Plaintiff's primary project during his employment with BASF was the General Purpose Permanent Label Adhesive Project ("GPP Project").[5] The project involved trying to improve the performance of certain adhesive product lines through scientific experimentation. The project was allotted a significant budget in the area of one million dollars and had several targets and time lines built in over the course of several years. (*Id.* ¶ 14.)[6]

---

[5] Without any support in the record whatsoever, Plaintiff repeatedly has claimed that Antonucci assigned him to a failing project (GPP). However, it is undisputed that, at the time of Plaintiff's assignment to the GPP Project, Antonucci was not his manager. Rather, Antonucci held the position of Senior Research Scientist and was his co-worker. Accordingly, Antonucci did not have the authority to assign Plaintiff's work at the time Plaintiff was assigned to the GPP Project. Similarly, Plaintiff's claim that he was assigned to a "failing project" is belied by the fact that the Company allocated significant funding to the project. (DE 61-2, Second Antonucci Aff. ¶ 3.)

[6] Antonucci was formally assigned to the GPP Project for a period of 3 ½ months prior to Plaintiff's hire and his responsibilities included some lab work but primarily focused on preparing the business (economic) case for the project, the literature background, and technical platform package that became the basis for the formal project proposal. (*See* DE 61-2, Second Antonucci Aff. ¶ 2.)

22.    In 2008 and 2009, Plaintiff reported to Michael Drewery, Product/Process Development Manager.  Drewery completed Plaintiff's 2008 and 2009 performance reviews and assigned him ratings of PL5 and PL4 respectively, on a scale of PL1 to PL9 with PL9 being the highest rating.  A PL5 stands for "meets expectations" and is a common rating for new employees who are learning their position.  A PL4 indicates that there are areas where improvement is required. (*Id.* ¶ 15.)

23.    Drewery's 2009 performance review of Plaintiff made it clear that Plaintiff needed to improve in the areas of communicating progress and details to stakeholders, engaging with business colleagues to help his progress in development programs, and ensuring his test results were representative when tested by others, including external customers.  Plaintiff was also expected to improve his working relationships with technical contacts and to gain a better understanding of how his technical programs impacted the business and manufacturing.  Plaintiff was required to achieve results in a timeframe needed by utilizing resources efficiently.  (DE 43-2, Antonucci Aff. ¶ 15, Attachs. A, B.)[7]

---

[7] Notably, Drewery's performance reviews for Antonucci in 2008 and 2009 are far more favorable than Plaintiff's.  In Antonucci's 2008 performance review from Drewery, Antonucci received a rating of PL-9 (the highest rating on a scale of PL-1 to PL-9), while Plaintiff received a rating of PL-5 from Drewery for the same time period.  (DE 61-2, Second Antonucci Aff. ¶ 4, Ex. A; DE 56-1 at 87-90.)  In Antonucci's 2009 performance review from Drewery, Antonucci received a rating

24.    On November 12, 2012, Plaintiff testified during his deposition that

Drewery did not discriminate against him:

> Q:    Do you contend, Mr. Dong, that Mr. Drewery
> discriminated against you because of your race or
> national origin?
>
> A:    Not that I know of.

(DE 43-4, Pl. Dep. at 85.)   Months later, on April 15, 2013, however, Plaintiff

contradicted himself, testifying as follows:

> Q.    And you're saying all of them or any of them
> could have discriminated against you?
> A.    For example, I would say I suspect I have data to –
> to – to indicate that Mike Drewery also
> discriminate against me?
> Q.    That Mike Drewery?
> A.    Yes.
> Q.    But you didn't mention anything about Mike
> Drewery in your EEOC charge.
> A.    That's why we have discovery phase.
> Q.    Well –
> A.    You – your – your – your documents have provide
> me – you have provide me suggest that and --
> Q.    What about the documents suggests that Mike
> Drewery discriminated against you on the basis of
> your race or national origin?
> A.    For example, I was told by Mike Drewery four or
> five in terms of performance grading is very good,
> you can get full bonus.  That's a fact, right?  And
> Jonathan Antonucci work on same TV project,
> failed.  His hourly rating probably like a eight,
> nine probably -- not average.  He also got nine.
> That would be an indication racial, national origin

of PL-8, as compared to Plaintiff's PL-4 rating from Drewery for the same time
period.  (DE 61-2, Second Antonucci Aff. ¶ 4, Ex. B; DE 56-1 at 91-94.)

> discrimination, an indication. . . . I never claim -- I
> have never claimed Jon Antonucci alone
> discriminate against me. He do not have that kind
> of power alone. BASF as a company support him
> to discriminate against me . . .
>
> . . .
>
> Q.   So who -- you're saying Mike Drewery now -- you
>      think that the performance reviews that he gave
>      you indicate that he has a discriminatory bias
>      based on your national origin and race?
> A.   Based on the data I -- no, based on the data.
> Q.   What's the data?
> A.   My performance review and other people's
>      performance review.
> Q.   Did he ever make any comments that were
>      discriminatory in any way to you?
> A.   I do not know any at this time. I do not know any
>      at the time.
> Q.   Besides Jon Antonucci and Mike Drewery, are
>      there any other individuals that you think have --
>      have a discriminatory bias against you --
> A.   No.

(DE 69-7, Pl. Dep. 444-445, 447.)

25.     In or around January 2010, Antonucci became Plaintiff's direct supervisor. In his prior role, Antonucci had occasion to interact with Plaintiff and had developed concerns regarding his performance. Upon becoming Plaintiff's supervisor, Antonucci began providing Plaintiff with regular feedback and coaching on multiple aspects of his work performance. For example, Antonucci coached Plaintiff on determining the statistical validity of his experimental results and using that information to gauge whether he was approaching project targets. Further, Antonucci coached Plaintiff on his communication skills both with

14

business colleagues and when giving presentations. (DE 43-2, Antonucci Aff. ¶ 16.)

26.    Antonucci also engaged in frequent discussions with Plaintiff regarding the progress of the GPP Project, which was significantly over-budget and had failed to make any concrete progress toward achieving a commercially viable product. Additionally, a structured meeting involving Plaintiff, Antonucci, and others was held every other week to review results and discuss feedback from the business on the GPP Project. (*Id.* ¶ 17.)

27.    In early 2010, it became clear that the GPP Project was not going to result in a commercially viable product. Thus, in or around February 2010, the project was terminated. (DE 43-4, Pl. Dep. 155-157; DE 43-2, Antonucci Aff. ¶ 18.)

28.    It is customary in the research and development area that, when a project is terminated after having expended significant time and money resources, and after conducting hundreds of scientific experiments that generate a large set of data, to prepare a detailed report to record the scientific achievements and deficiencies. Plaintiff was assigned the task of preparing the report for the GPP Project and, as a Senior Scientist, should have had the skills and abilities to perform that task. However, after working on the report for two weeks, Plaintiff submitted to Antonucci a cryptic four page draft that lacked clear explanation of

any observations and failed to identify any key achievements or deficiencies in the project. (DE 43-2, Antonucci Aff. ¶ 19.)

29.    Upon receiving this report, Antonucci explained to Plaintiff in great detail what he was looking for and asked him to rewrite the report. However, Plaintiff was unable to complete a satisfactory report without significant input from Antonucci and the process took numerous drafts to resemble what Antonucci was requesting. (*Id.* ¶ 20.)

30.    Subsequently, Plaintiff was assigned to work on the Acronal 3624 project for which he was charged with overseeing the transfer of a recipe from Europe to North America in order to validate the European results in North America. In that assignment, Plaintiff was responsible for taking a recipe that someone else developed, scaling it up and preparing it to be produced in North America, making sure that the raw materials and processes were valid, doing matches at lab scale, and then transferring it to pilot production and then manufacturing. In that project, Plaintiff reversed a few of the key raw materials, transcribing the recipe improperly, with the result that Plaintiff could not achieve the results expected and ended up wasting Company resources to the magnitude of approximately $20,000. (*Id.* ¶ 22.)

31.    After Plaintiff's deficient work on the GPP Project report and the sloppy errors in his work on the Acronal 3624 project, Antonucci and others,

16

including Dr. Zhao, determined that Plaintiff's overall work performance was unsatisfactory. (*Id.* ¶ 22.)

32.    In addition to the above, Antonucci concluded that, among other things, Plaintiff's interpretation of lab results was poorly executed, his interaction with and communication to the business group was ineffective, and his administration of development programs was substandard. Further, Plaintiff did not direct work with an awareness of budget constraints, resulting in significant budget overruns. Plaintiff was not able to execute intuition, a scientific method of research, or apply technical knowledge to short-cut projects to a successful conclusion. Antonucci also observed that Plaintiff did not demonstrate leadership abilities in line with his level of employment. (DE 43-2, Antonucci Aff. ¶ 22.)

33.    Dr. Zhao concluded that Plaintiff's problem solving skills were not at the level one would expect of a Senior Research Scientist. He was inefficient in designing and carrying out experiments; he spent an excessive amount of time and resources running side experiments and repeating failed experiments. Additionally, Plaintiff was unable to interpret and draw conclusions from the results of his experiments, or to reduce his knowledge of emulsion polymerization to practical and commercially viable products. (DE 43-3, Zhao Decl. ¶ 8.)

34.    Antonucci and Dr. Zhao discussed Plaintiff's poor performance, as did Antonucci and Detlef Ruff, Dr. Zhao's dotted-line supervisor in Germany.

17

(DE 42-12,[8] Antonucci Aff. ¶¶ 5-8; DE 43-3, Zhao Decl. ¶ 10.)

35.     Antonucci recommended that BASF terminate Plaintiff's employment.  Dr. Zhao supported the decision to terminate Plaintiff's employment.  (DE 43-2, Antonucci Aff. ¶ 23; DE 43-3, Zhao Decl. ¶ 11.)  On August 2, 2010, Plaintiff's employment with BASF was terminated for unsatisfactory performance.  (*Id.*; DE 43-6, Pl. Dep. 360.)  At no time did Antonucci or Dr. Zhao consider Plaintiff's race or national origin when making the decision to terminate his employment.  (DE 43-2, Antonucci Aff. ¶ 23; DE 43-3, Zhao Decl. ¶ 12.)

36.     Antonucci completed a 2010 performance review for Plaintiff in which his performance was rated a PL1, the lowest rating.  (DE 43-2, Antonucci Aff. ¶ 24, Attach. C.)  The August 2010 review references Plaintiff's performance on the GPP Project (not the GPP's failure itself) throughout.  For example, Antonnucci stated, "a technical report issued in the Spring required heroic direction from supervisor and was still of very little value at the end of the one month process even though 2 years and $1.5M were expended on the topic of the report."  (DE 52-3 at 45.)  Further, for the "Customer and Market Focus" category, Antonucci remarked, "This skill is most evident in the GPP development project as the next generation product developed did not have the key performance attributes that are demonstrated in the incumbent product on which its market differentiation

---

[8] DE 42-12 is Antonucci's Affidavit in Support of Defendants' Response to Plaintiff's April 10, 2013 Motion to Compel, filed April 29, 2013.

18

is built." (DE 52-3 at 47.) Antonucci summarized Plaintiff's overall performance as follows:

> Yan's work is substandard to his level of employment as a senior research scientist. His communication with project stakeholders is ineffective. He designs very large numbers of experiments that do not show a pattern of logic or a direction towards the desired solution. He clearly understands the basic theory behind his work, but his inability to document key learnings from experiments demonstrates that he cannot make the connection between the academic and practical aspects of his work.

(DE 52-3 at 48.)

37.    BASF does not have any formal policy or requirement that employees be placed on a PIP prior to termination. (DE 42-12, Antonucci Aff. ¶ 4.) Employment at BASF is "at-will" meaning that either the employee or the Company may terminate the employment relationship at any time and for any reason. (*Id.*)

38.    The Company determined it did not make business sense to place Plaintiff on a PIP as it would have required assigning him to another project and funding the project. Antonucci and Dr. Zhao decided that Plaintiff's skill set was too far below what it should be to expect he could successfully complete a PIP, and it would not have been prudent to allocate additional money and resources to another project for Plaintiff. (DE 43-3, Zhao Decl. ¶ 11.)

39.    Following Plaintiff's termination, BASF hired a German delegate

19

named Nicholas Foley at a lower level than Dong held during his employment. (DE 43-2, Antonucci Aff. ¶ 25.)

### D.  Plaintiff's Charge of Discrimination and Allegations During the Administrative Proceedings

40.    Plaintiff received a copy of the Company's EEO policy and complaint procedures, as well as the Company's Code of Conduct, during his employment. (DE 43-7 & 43-8, Pl. Dep. Exs. 4-7.)

41.    On December 8, 2010, Plaintiff filed a Charge of Discrimination against "BASF-Charlotte Tech Ctr" with the EEOC.  (DE 43-10, Pl. Dep. Ex. 17.) In his Charge, Plaintiff alleged that he had been discriminated against based upon his race/national origin (Asian/Chinese) when he was terminated from his position with BASF.  His Charge states that the earliest date discrimination took place was August 2, 2010 – the date of his termination.  (*Id*.)

42.    Plaintiff's Charge makes no mention of any discriminatory comments by Antonucci or anyone else; rather, his Charge alleges that he was "never given any warnings about [his] work performance, nor was [he] even placed on a performance improvement plan."  (*Id.*)  Similarly, Plaintiff never mentioned any discrimination by Drewery.  (*Id*.)

43.    In his Intake Questionnaire to the EEOC, Plaintiff indicated he did not know why he believed BASF's actions were discriminatory.  (DE 42-1 & 42-3, Hughes Aff. ¶ 3, Attach. A.)  Plaintiff then indicated he had been "sudden[ly]

terminat[ed] by giving false performance review." (*Id.*)

44.     During the EEOC administrative process, Plaintiff told the EEOC that he was discriminated against by Defendant Antonucci, his supervisor who had completed the 2010 performance review (i.e. the review that Plaintiff claimed was "false") and who had recommended his termination. (DE 43-10, Pl. Dep. Ex. 18.)

45.     Plaintiff identified three alleged "facts" to the EEOC that he believed demonstrated Antonucci's discriminatory termination of his employment:

> a.     He made intentional false statements on my performance;
> b.     He degraded the satisfactory results (met/succeeded pre-determined targets) achieved by me for the GPP project, which were valued by previous management and the project team;
> c.     He forced absolutely unreasonable time lines (e.g. the 5 days) on me and refused to give me adequate reasons.

(*Id.*)

46.     In BASF's position statement to the EEOC, BASF stated, in pertinent part, "In 2010, it became clear to those involved in the GPP Project that it was not successful. However, it was not the failure of the project that was the basis of Dong's termination. Rather, it was Dong's inability to manage the project on several levels that convinced management that Dong was not capable of performing the position for which he was hired." (DE 52-3 at 53.) The position statement then recounts specific deficiencies in Plaintiff's performance, including

21

but not limited to, Plaintiff's inability to prepare a report interpreting and drawing conclusions from his GPP experiments.  (DE 52-3 at 54.)[9]

47.    The EEOC issued a no-cause finding and dismissed Plaintiff's EEOC Charge on or about September 1, 2011.  (DE 43-10, Pl. Dep. Ex. 19.)

### E.    Plaintiff's Complaint and Deposition Testimony

48.    Plaintiff filed the Complaint in this lawsuit on November 30, 2011, alleging he was terminated because of his race and national origin (Asian/Chinese) in violation of Title VII.  (DE 1.)

49.    In his Complaint, Plaintiff alleges for the first time that Antonucci used the term "Chinaman" in the March 2008 to December 2009 time frame "at least several times."  (*Id.* ¶ 17.)

50.    In his deposition, Plaintiff claimed that he "remembers" Antonucci using the term "Chinaman" three times.  (DE 43-4 & 43-5, Pl. Dep. 123, 290-292.) First, in or around December 2009, prior to becoming Plaintiff's supervisor, Antonucci was on the phone one day and purportedly said the word "Chinaman." (DE 43-4, Pl. Dep. 121.)  Plaintiff had no further details about this incident.  Next, Plaintiff purportedly remembered another time right after he joined BASF

---

[9] Plaintiff's repeated assertions in his appellate brief that he was terminated because the GPP Project failed (Appeal Doc. 11 at 45 of 54), are belied by the undisputed fact that Plaintiff's employment was not terminated in February 2010 when the project was shut down.  Rather, his employment was terminated in August 2010.

(February 2008) when Antonucci was showing him computer software. Plaintiff remembers having a bad cough at the time but remembers no other details about Antonucci's alleged use of the term "Chinaman." (DE 43-5, Pl. Dep. 294.) Plaintiff then testified that the third time was likely in the March 2010 time-frame when Antonucci was reviewing a report. (DE 43-4, Pl. Dep. 124-125.)[10]

51.    In his deposition, Plaintiff testified that he believed the following "evidence" demonstrated that he had been discriminated against on the basis of his race and national origin when he was terminated:

> a.    He claims that he reached all of his targets on the GPP Project, and yet was fired (*id.* at 119);
> b.    He received a PL1 rating (the lowest rating) on his 2010 performance review (*id.* at 120); and
> c.    He cites the alleged Chinaman comments by Antonucci. (*Id.* at 120-121.)

52.    Plaintiff admitted that he never mentioned that Antonucci allegedly used the term "Chinaman" in his EEOC Charge or in his multiple communications with the EEOC during its investigation. (*Id.* at 200-203.)

**F.    Luis Varela and Andrea Hamilton**

53.    Luis Varela ("Varela"), who has worked for BASF since August 23, 1999, was the principal inventor of the super all-temperature technology which is being commercially sold by BASF (and, in fact, BASF is the market leader in this

---

[10]    Antonucci denies ever using the term "Chinaman," but for purposes of Defendants' summary judgment motion, Defendants accepted Plaintiff's allegations as true.

technology). (DE 61-2, Second Antonucci Aff. ¶ 5.) Plaintiff succeeded Varela as the principal R&D Scientist on the GPP Project. (*Id*. ¶ 6.) While Varela was assigned the duty of supporting the GPP Project in 2009, his duties differed from Plaintiff's, as reflected by Varela's and Plaintiff's performance reviews for 2009. (*Id.* ¶ 6 (noting the comparison of Dong's performance reviews attached as Exs. A, B & C to Antonucci's May 2, 2013 Affidavit (DE 43-2 at 9-27) with Varela's performance reviews attached as Ex. 1 to Affidavit of Yan Dong (DE 56-1 at 3-14)).)

54.     Varela was a stronger performer than was Plaintiff, as reflected in his performance reviews from 2008 and 2009 from Drewery, who was also Plaintiff's supervisor and evaluated Plaintiff's performance for the same time period. (DE 61-2, Second Antonucci Aff. ¶ 7; DE 43-2 at 9-18.) Varela received a performance rating of PL-7 for 2008 and a PL-5 rating for 2009 from Drewery, as compared to Plaintiff's ratings of PL-5 for 2008 and PL-4 for 2009 from Drewery. (*Id*.)[11] Varela also received a higher performance rating from Antonucci for 2010 than did Plaintiff; Varela received a PL-5 while Plaintiff received a PL-1. (DE 61-2, Second Antonucci Aff. ¶ 8, Ex. C; DE 52-3 at 41-48.)

55.     Andrea Hamilton ("Hamilton") was one of Plaintiff's former co-

---

[11] Significantly, these were not ratings from the alleged discriminator, Antonucci. Rather, they were from Drewery who Plaintiff admitted, under oath, did not discriminate against him based on his race/national origin, before later contradicting himself.

workers.  In contrast to Plaintiff, who lacked the scientific skills to do his job, Hamilton demonstrated a strong fundamental scientific skill set but had difficultly applying that skill set to particular tasks.  Antonucci found that Hamilton was a bright and conscientious scientist who needed to show more initiative and to develop stronger leadership and project management skills.  (DE 61-2, Second Antonucci Aff. ¶ 17.)

56.    In September 2010, Hamilton received an evaluation and review of target agreement objectives in conjunction with the transfer of supervisory responsibility of her from Antonucci to Arno Tuchbreiter.  (DE 70-3 at 24 of 61.)

## V.    SUMMARY OF ARGUMENT

### A.    Review of Award of Summary Judgment

The Fourth Circuit will review an award of summary judgment de novo. *Hawkspere Shipping Co., Ltd. v. Intamex, S.A.*, 330 F.3d 225, 232 (4th Cir. 2003). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A motion for summary judgment provides the court an opportunity to assess all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial is present.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). The substantive law governing Plaintiff's claims determines which facts are material and which are

25

relevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, a fact is material only if it might affect the outcome of the suit under governing law. *Id.*

At summary judgment, BASF bears the initial responsibility of informing the court of the grounds for its motion and specifically identifying the evidence that it believes demonstrates the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once this initial burden is met, the burden shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322 n.3.

Here, the record amply supports the District Court's award of summary judgment in Defendants' favor. First, the District Court correctly held that Plaintiff could not establish a *prima facie* case of discrimination because, among other things, the record evidence demonstrates that Antonucci and Zhao determined Plaintiff was not meeting performance expectations as of August 2010, the time of his termination. Second, the District Court properly determined that, even if Plaintiff had established a *prima facie* case of discrimination, he failed to rebut Defendants' legitimate, non-discriminatory reasons for Plaintiff's termination – namely, his unsatisfactory performance. In addition, while the District Court properly applied controlling Fourth Circuit precedent to exclude Plaintiff's belated "Chinaman" comments, the District Court further held that, even if the

26

"Chinaman" comments were taken into account, the alleged comments were remote in time and unrelated to the termination decision. Therefore, such comments failed to create a genuine issue of material fact regarding Antonucci's alleged bias concerning Plaintiff's August 2010 termination. The District Court correctly acknowledged that Plaintiff simply disagrees with Antonucci's and Zhao's assessment of his performance. Moreover, the undisputed "other evidence" Defendants submitted further undermines any finding of unlawful discrimination regarding Plaintiff's August 2010 termination.

**B.    Review of Denial of Motion to Extend the Discovery Period For a Fourth Time and Denial of Plaintiff's Motions to Compel Discovery**

Plaintiff also purports to appeal the Magistrate Judge's May 10, 2013 Order denying a fourth extension of the discovery period and Plaintiff's second and third motions to compel discovery. Plaintiff's challenge to this Order is reviewed under an abuse of discretion standard. *See Wells v. Liddy*, 186 F.3d 505, 518 n.12 (4th Cir. 1999). As shown below, Plaintiff has set forth no facts or legal argument to support any finding that the denial of his discovery motions was an abuse of discretion.

**VI.    ARGUMENT**

**A.    The District Court Properly Found That Plaintiff Cannot Establish a *Prima Facie* Case of Discrimination**

The District Court held that Plaintiff's Title VII claim should be analyzed as

27

a wrongful termination claim. (DE 78 at 8.) To establish a prima facie case of wrongful termination under Title VII, Plaintiff is required to show that: "(1) [he] is a member of a protected class; (2) [he] suffered [an] adverse employment action; (3) [he] was performing [his] job duties at a level that met [his] employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (en banc). The District Court "assume[d] without deciding that plaintiff [had] made the requisite showing as to elements one, two, and four." (DE 78 at 9.) However, the District Court found that Plaintiff had presented no admissible evidence that he was performing his job at a level that met BASF's expectations at the time of his termination in August 2010. (*Id.*) The District Court's conclusion is fully supported by the record evidence.

Plaintiff testified in his deposition that his supervisor, Antonucci, knew his work product. (DE 43-4, Pl. Dep. 177.) Antonucci described Plaintiff's performance and work product as unsatisfactory, and the 2010 performance review Antonucci completed for Plaintiff is consistent with this finding. (DE 43-2, Antonucci Aff. ¶ 24, Attach. C.)

Notably, for purposes of establishing a *prima facie* case, whether an employee is performing at a level that meets legitimate expectations is based on the

employer's perception. *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003). Thus, the Court must look to Antonucci's assessment and Zhao's assessment – not Plaintiff's self-serving assessment or the assessment of non-decision makers[12] – for purposes of the *prima facie* analysis. It remains undisputed that Antonucci and Zhao determined that, at the time of his termination, Plaintiff was not performing at a level that met legitimate expectations. Therefore, the District Court correctly found that Plaintiff cannot establish a *prima facie* case of discrimination as a matter of law.[13]

---

[12] Plaintiff attaches a reference letter from James Duis provided to him (at his request) in an effort to bolster his claim that his performance was "good." (DE 57-1 at 3.) However, Mr. Duis was not Plaintiff's supervisor and therefore, does not have personal knowledge of Plaintiff's overall performance, including the problems that Antonucci encountered in trying to work with Plaintiff on producing an effective "lessons learned" report or Plaintiff's performance on the Acronal project. Moreover, Duis did not take part in the termination decision.

[13] Just as he did in his summary judgment response before the District Court, Plaintiff's appellate brief spends a significant amount of time discussing his alleged "milestones" in the GPP Project, including the GPP Project passing Gate 3 review, his alleged "technological breakthrough" in the GPP Project which he reported in a BASF Invention Proposal and BASF's initiation of the GPP patent filing. (*See, e.g.,* Appeal Doc. 11 at 12-14, 24 of 54.) However, Plaintiff simply ignores the undisputed record evidence that the GPP Project was terminated following Gate 3 review, that his alleged "technological breakthrough" did not result in a commercially viable product, and that BASF terminated the GPP patent filing as not worthwhile. Put simply, if Plaintiff's personal opinion and representation of his performance were true, the GPP Project would have been a resounding success. While, as repeatedly stated by Defendants, Plaintiff's performance was not terminated simply because the GPP Project failed, Plaintiff nonetheless cannot attempt to show that his performance was good by touting "milestones" and "breakthroughs" that he allegedly achieved on the project when,

**B.    The District Court Properly Found That Plaintiff Cannot Establish that the Company's Legitimate, Non-Discriminatory Reason for His Termination Was Pretextual**

If a plaintiff establishes a *prima facie* case, the burden then shifts to the employer to articulate (not prove) a legitimate, non-discriminatory reason for its employment decision. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

If the employer can do so, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the employer's proffered reasons were a pretext for its true motive of discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

In the Fourth Circuit, the ultimate question for pretext is whether the decision-maker(s) honestly believed their explanation for the decision at issue. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 215 (4th Cir. 2007); *Price v. Thompson*, 380 F.3d 209, 213-16 n.1 (4th Cir. 2004) (citations omitted) ("[p]retext is a lie, not merely a mistake.").

BASF has articulated a legitimate, non-discriminatory reason for Plaintiff's termination, namely that the decision-makers – Antonucci and Zhao – determined that Plaintiff's performance was unsatisfactory. Because BASF has articulated a legitimate, non-discriminatory explanation for Plaintiff's termination, the burden

_____

in fact, the project was terminated because it failed – and about which there is no dispute.

shifts back to Plaintiff to demonstrate by a preponderance of the evidence that BASF's explanation was a pretext for their true motive of discrimination. *Reeves*, 530 U.S. at 143.

Here, Plaintiff can set forth no evidence to support a finding that either Antonucci or Dr. Zhao did not honestly believe the reasons for the termination decision. Plaintiff's entire case stems from his personal disagreement with Antonucci's and Dr. Zhao's assessment of his work performance. However, "[t]he crucial issue in a [discrimination] case is whether the employer has an unlawfully discriminatory motive, not the wisdom or folly of the employer's business judgments." *Harris v. Rumsfeld*, 428 F. Supp. 2d 460, 467 (E.D.Va. 2006) (citations omitted), *appeal dismissed*, 207 F. App'x 343 (4th Cir. 2006).

It is the perception of the decision-maker which is relevant, <u>not</u> Plaintiff's personal assessment. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 955, 960-61 (4th Cir. 1996).[14] Courts will not second-guess an employer's business judgment. *See E.E.O.C. v. Clay Printing Co.*, 955 F.2d 936, 946 (4th Cir. 1992) ("It is not for this court or any other governmental agency to direct the business practices of any company."); *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 272 (4th Cir. 2005) (citation omitted) (the court does "not sit as a 'super-

---

[14] *See also King*, 328 F.3d at 149; *Hawkins v. PepsiCo., Inc.,* 203 F.3d 274, 280 (4th Cir. 2000); *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980); *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998); *Holland*, 487 F.3d at 217; *Sook Yoon v. Sebelius*, 481 F. App'x 848, 851 (4th Cir. 2012).

personnel department weighing the prudence of employment decisions' made by the defendants"); *Hawkins*, 203 F.3d at 281 (4th Cir. 2000) ("[I]t is for [the employer], not the courts, to rule on the wisdom and generosity of [its supervisors'] management practices.").[15]

Plaintiff set forth <u>no</u> competent evidence whatsoever that Antonucci and Dr. Zhao did not honestly believe his work performance was unsatisfactory; nor did he point to any competent evidence to support a finding that Antonucci or Dr. Zhao considered his race or national origin in connection with the termination decision. To the contrary, the undisputed record evidence confirms that neither Antonucci nor Dr. Zhao took Plaintiff's race or national origin into account when making the termination decision. (DE 43-2, Antonucci Aff. ¶ 23; DE 43-3, Zhao Decl. ¶ 12.)

### C.    The District Court Did Not Disregard *Reeves*

Plaintiff's appellate brief contends that the district court "disregarded" *Reeves* (Appeal Doc. 11 at 8 of 54) and "[e]rred in applying a '[p]retext plus' [s]tandard" to his claims. (Appeal Doc. 11 at 35 of 54.) Plaintiff misreads the District Court's decision.

First, although the District Court did not specifically cite *Reeves*, it did

---

[15] *See also Duffy v. Belk*, 477 F. App'x 91, 94 (4th Cir. 2012) (citations omitted) ("[I]n the context of employment discrimination cases '[i]t is not for this court … to direct the business practices of any company'… nor 'sit as a super-personnel department weighing the prudence of employment decisions made by the defendants.'").

32

correctly set forth the appropriate analysis articulated in *Reeves*. *Reeves* held, in pertinent part, that a prima facie case and sufficient evidence of pretext may permit a trier of fact to find unlawful discrimination, without additional independent evidence of discrimination, though such showing will not always be adequate to sustain a jury's finding of liability. "That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'" *Reeves*, 530 U.S. at 143 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). The District Court's language here stated: "plaintiff must demonstrate that 'as between [the discriminatory reason] and the defendant's explanation, [the discriminatory reason] was the more likely reason for the dismissal, <u>or</u> that employer's proffered explanation is simply unworthy of credence." (DE 78 at 12) (emphasis added) (citation omitted). The District Court then found that, "[h]aving not presented evidence of pretext, defendant is also entitled to summary judgment as [BASF's] legitimate, non-discriminatory reason for plaintiff's termination has not been rebutted." (*Id*. at 13.) The District Court nowhere required Plaintiff to satisfy any "pretext plus standard" or submit any "additional evidence"[16] above

---

[16] If anything, it is Plaintiff who has ignored the "additional evidence" Defendants submitted, pursuant to *Reeves*, which undermines Plaintiff's discrimination claim. For example, it remains undisputed that, during his employment with BASF, Antonucci has hired and promoted other Asian/Chinese individuals. (DE 43-2, Antonucci Aff. ¶ 9.) For example, Antonucci recommended for hire an individual

and beyond establishing a prima facie case and evidence of pretext.[17]

### D. The District Court Did Not Disregard *National Railroad Passenger Corporation v. Morgan*

Plaintiff contends that the District Court erred in excluding consideration of the purported "Chinaman" comment. (Appeal Doc. 11 at 44 of 54.) In support for this contention, Plaintiff relies upon the Supreme Court's 2002 decision in *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101 (2002). However, Dong misreads both the District Court's opinion and the *Morgan* case, and he ignores this Court's controlling authority in *Balas v. Huntington Ingalls Industries, Inc.*, 711 F.3d 401 (4th Cir. 2013).

---

by the name of Don Cho. Additionally, he recommended for promotion to a delegation in Germany another employee by the name of J.D. Kim. (*Id.* ¶ 10.) Moreover, it remains undisputed that one of the decision-makers involved in Plaintiff's termination – Dr. Cheng-Le Zhao - is of Asian/Chinese descent. (DE 43-3, Zhao Decl. ¶ 4.) This additional evidence further undermines Plaintiff's claims. *See Demesme v. Montgomery Cnty. Gov't*, 63 F. Supp. 2d 678, 683 (D.Md. 1999) (citing *Love v. Alamance Co. Bd. of Educ.*, 757 F.2d 1504, 1509 (4th Cir. 1985)); *see also Rooks v. Girl Scouts of Chicago*, 95 F.3d 1154, *4 (7th Cir. 1996) (citations omitted) ("if the decision-maker is in the same protected class as plaintiff, claims of discrimination become less plausible").

[17] Plaintiff's appellate brief complains that the District Court mistakenly relies upon *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993) and that several courts of appeals have misread *Hicks* as allowing the "pretext plus" standard. (Appeal Doc. 11 at 36-37 of 54.) However, *Reeves* did not overrule *Hicks*, nor did the District Court's opinion misread or misapply *Hicks*. Indeed, *Reeves* reiterated *Hicks*' holding that satisfaction of a prima facie case, <u>combined</u> with falsity of the employer's explanation, <u>may</u> be sufficient to show intentional discrimination. Here, however, Plaintiff can show <u>neither</u> a prima facie case <u>nor</u> falsity of the explanation for his termination decision. Thus, under both *Hicks* and *Reeves*, BASF is entitled to summary judgment as a matter of law.

1.    *Morgan*

The plaintiff in *Morgan* had filed a charge of discrimination and retaliation with the EEOC alleging that he was "consistently harassed and disciplined more harshly than other employees on account of his race."   536 U.S. at 105.   The Supreme Court noted that, "[w]hile some of the allegedly discriminatory acts about which Morgan complained occurred within 300 days of the time that he filed his charge with the EEOC, many took place prior to that time period." *Id*. at 106.   The issue presented concerned whether and to what extent the plaintiff could recover for discrete acts of discrimination and/or on his hostile work environment theory for acts occurring more than 300 days before the charge was filed.

After reviewing its prior decisions interpreting EEOC charge filing requirements, the Court stated:

> We derive several principles from these cases.   First, discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.   Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180-or 300-day time period after the discrete discriminatory act occurred.   The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed.   Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.

*Morgan*, 536 U.S. at 113. Plaintiff here relies upon this last sentence in *Morgan* to support his argument that the district court's "exclusion" of the purported "Chinaman" comment was reversible error. (Appeal Doc. 11 at 44 of 54.) However, as noted above, in *Morgan*, the plaintiff complained to the EEOC about various acts that were outside the 300-day period applicable to that matter. Here, Plaintiff <u>never mentioned</u> the purported "Chinaman" comments to the EEOC. Indeed, the record evidence confirms that the first time BASF was put on notice about these purported comments was upon receipt of Plaintiff's <u>lawsuit</u>.

### 2.   Title VII's EEOC Charge Requirements and the Fourth Circuit's Recent Published Opinion in *Balas*

Pursuant to Title VII, "an employee cannot seek redress in federal court for an employer's alleged discriminatory conduct unless he filed a charge of discrimination with the EEOC within 180 days 'after the alleged unlawful practice occurred.'" *Hospodor v. Burlington Industries, Inc.*, 205 F.3d 1333, *1 (4th Cir. 2000) (citing 29 U.S.C. § 626(d) (1994), 42 U.S.C. § 2000e-5(e) (1994), and *McCullough v. Branch Banking & Trust Co*., 35 F.3d 127, 131 (4th Cir. 1994)). Indeed, Title VII states:

> Whenever a charge is filed…the Commission shall serve a notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) on such employer… within ten days, and shall make an investigation thereof. Charges shall be in writing under oath or affirmation and shall contain such information and be in such form as the Commission

requires.

42 U.S.C. § 2000e-5(b).

According to Plaintiff, Antonucci used the term "Chinaman" well prior to the 180 day filing requirement for Plaintiff's EEOC Charge. Thus, Plaintiff failed to timely make this claim in support of his Charge. The Fourth Circuit recently addressed these charge-filing requirements in *Balas v. Huntington Ingalls Industries, Inc.*, 711 F.3d 401, 406-409 (4th Cir. 2013) ("*Balas II*").

In *Balas v. Huntington Ingalls Industries, Inc.,* Civil Action No. 2:11cv347, 2011 WL 4478864, at *1, 4 (E.D.Va. Sept. 26, 2011) ("*Balas I*"), the plaintiff, a former employee of the defendant, filed an EEOC Charge in July 2010 referencing an August 2009 incident in which she was sent home to change clothes after coming to work in ripped jeans.[18] This July 2010 EEOC charge originally contained only the claim that she had been discriminated against due to her sex and retaliated against when her employer terminated her employment. The plaintiff also alleged that she received a harsher punishment for falsifying time records than did her similarly-situated male co-workers.

In October 2010, the plaintiff filed an Amended EEOC Charge to include an additional allegation that her former supervisor had inappropriately hugged her in

---

[18] The only specific occurrences stated in the charge were her February 17, 2010 termination and the 2009 jeans incident, and the charge listed February 17, 2010 as the "earliest" and "latest" date of discrimination. *Balas II*, 711 F.3d at 405.

37

January 2010.  *Balas I*, 2011 WL 4478064, at *1.  Both her original and Amended EEOC Charges were preceded by a letter to the EEOC providing greater detail to her claims, and the plaintiff had also submitted an intake questionnaire at the beginning of the administrative process.   After the EEOC investigated and dismissed the plaintiff's Charge, the plaintiff filed a lawsuit.  In her subsequent lawsuit, the plaintiff's complaint contained a myriad of allegations of sexual harassment far beyond the inappropriate hug referenced in her Amended Charge. Upon the employer's motion for judgment on the pleadings, the district court decided it lacked jurisdiction to consider allegations that were not included in the Charge.   The district court declined to consider Balas' intake questionnaire or letters.  *Balas I*, 2011 WL 4478864, at *3, 4; *Balas II*, 711 F.3d at 405.

The district court, construing the plaintiff's charge liberally, found she "alleged discriminatory or retaliatory termination and <u>harassment by her supervisor</u>." *Balas I*, 2011 WL 4478864, at *4*; *Balas II*, 711 F.3d at 405.  The district court, however, dismissed her harassment claim on the finding that the plaintiff's additional allegations in support of her harassment claim in her lawsuit fell beyond the scope of her EEOC charge.  *Id*.  The district court determined that "Balas's allegation that Price 'hugg[ed][her] and thanked [her] for the Christmas cookies [she] gave him as a gift and said [she] never cease[d] to amaze him' (Doc. 7–2), is not suggestive of the long-term sexual harassment alleged in the Complaint

(Doc. 1–1 at paras. 7–8, 10). . . . Therefore, the alleged harassment by Price, other than the hugging incident, is beyond the scope of Balas's EEOC charges and outside the subject matter jurisdiction of the Court." *Balas I*, 2011 WL 4478864, at *5.

On appeal to the Fourth Circuit, Balas argued that the district court erred by considering only her Amended EEOC Charge – and not the intake questionnaire and two letters she sent to the EEOC – in evaluating whether she stated a claim for trial. The Fourth Circuit emphasized that "federal courts lack subject matter jurisdiction over Title VII claims for which a plaintiff has failed to exhaust administrative remedies." *Balas II,* 711 F.3d at 406 (citing *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009)). In discussing the administrative process, the Fourth Circuit in *Balas II* observed, in pertinent part:

> In any subsequent lawsuit alleging unlawful employment practices under Title VII, a federal court may only consider those allegations included in the EEOC charge. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962-63 (4th Cir. 1996) ("The allegations contained in the administrative charge of discrimination generally operate to limit the scope of any subsequent judicial complaint.").
>
> +++
>
> In determining what claims a plaintiff properly alleged before the EEOC, we may look only to the charge filed with that agency. We have noted that "it would be objectively illogical to view a private letter from a complaining party to the EEOC as constructively amending a formal charge, given that one of the purposes of requiring a party to file charges with the EEOC is to

39

> put the charged party on notice of the claims raised against it." *Sloop v. Mem'l Mission Hosp., Inc.*, 198 F.3d 147, 149 (4th Cir. 1999). *Sloop's* reasoning applies here, despite Balas' contentions to the contrary. Balas argues that her letters, written before formal charges were filed, should be treated differently. We disagree. Given that Balas's employer was never apprised of the contents of her letters (nor could she expect it to have been), the point at which they were written makes no difference for the goals of putting her employer on notice or encouraging conciliation.

*Id.* at 407-08 (emphasis added). The Fourth Circuit affirmed the district court's dismissal of plaintiff's failure to promote and hostile work environment claims which were based on allegations not included in her EEOC Charge. *Id.* at 408-09.

Applying *Balas* to the present case, because Plaintiff's EEOC Charge made no mention of the purported "Chinaman" comments, any attempt to state his claim based upon those comments fails as a matter of law. First, as noted above, all three purported "Chinaman" comments allegedly occurred more than 180 days prior to Plaintiff's single EEOC Charge from December 2010. (DE 43-4 & 43-5, Pl. Dep. 123-125, 290-292, 294.) *Balas* requires dismissal of Dong's Title VII claim to the extent it relies upon these comments which were made outside the specified time period. Indeed, Plaintiff's Charge confirms that the earliest date that alleged discrimination took place was August 2, 2010 – his termination date. (DE 43-10, Pl. Dep. Ex. 17.) Moreover, these comments are entirely <u>new</u> allegations that were not identified in the EEOC Charge. BASF had no opportunity to address these

40

recent allegations in the administrative process. Accordingly, they fall outside of the scope of Plaintiff's Charge, and the District Court properly held that it lacked subject matter jurisdiction to consider these new allegations.

Knowing that he cannot avoid *Balas'* holding and the district court's interpretation and application thereof, Plaintiff's appellate brief addresses *Balas* in one sentence:

> Completely different from *Balas v. Huntington Ingalls Industries, Inc.*, 711 F.3d 401 (4th Cir. 2013), the derogatory remark was evidence in support of Dong's national origin discrimination charge, which was in his EEOC filing (SA-239).

(Appeal Doc. 11 at 44 of 54.) Plaintiff's attempt to distinguish *Balas* is unavailing. Plaintiff's EEOC Charge alleged he was discriminated against on the basis of his race and national origin, but <u>nowhere</u> in his EEOC Charge, or in any communications with the EEOC, did Plaintiff mention the purported use of the term "Chinaman" by Antonucci. Similarly, in *Balas*, plaintiff's EEOC Charge claimed, among other things, harassment by her supervisor but failed to include most of the harassing conduct by her supervisor alleged in her lawsuit complaint. Thus, *Balas* is directly on point and compels the finding that the alleged "Chinaman" comments could not properly be considered.

### 3.    The Purported "Chinaman" Comments are Stray Remarks

Even though the District Court properly determined that the "Chinaman"

41

remarks should be excluded as outside the scope of Plaintiff's Charge, the District

Court went further and held that, even if the alleged comments were considered,

"they do nothing to satisfy plaintiff's burden."  (DE 78 at 10.)  Indeed, the District

Court stated that,

> If they were admissible, these remarks without more are not enough to prove discrimination because they do not suggest that Defendant Antonucci was motivated by racial or national origin animus at the time he terminated plaintiff.  See Brinkley v. Harbour Recreation Club, 180 F.3d 598, 608 (4th Cir. 1999) ("[T]o prove discriminatory animus, the derogatory remark cannot be stray or isolated, and unless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of discrimination.") Indeed, there is absolutely no connection, temporal or otherwise, shown between the comments in and before March 2010 and the adverse employment action taken in August 2010.

(DE 78 at 10-11.)

Thus, even if Fourth Circuit precedent did not require exclusion of the

comments, Plaintiff nevertheless cannot establish a discriminatory animus based

on these alleged comments.  *See Clay Printing Co*., 955 F.2d at 938 (plaintiff

cannot establish Title VII claim through stray comments); *Fuentes v. Perskie*, 32

F.3d 759, 767 (3rd Cir. 1994) (quoting *Ezold v. Wolf, Block, Schorr and Solis-

Cohen*, 983 F.2d 509, 545 (3rd Cir. 1992)) ("Stray remarks by non-decision-

makers or by decision-makers unrelated to the decision process are rarely given

great weight, particularly if they were made temporally remote from the date of the

decision.”); *Connolly v. Pepsi Bottling Group, LLC*, 347 F. App’x 757, 761 (3d Cir. 2009) (comments made by employee’s supervisor who was involved in the termination decision were insufficient to prevent summary judgment in favor of employee on employee’s ADEA claim where the comments were made four months prior to the termination decision and were made outside the context of the decision-making process).

In an effort to somehow connect Antonucci’s alleged comments with his termination, Plaintiff repeatedly asserts that Antonucci recommended his termination in March 2010. More specifically, Plaintiff claims:

- “On March 16, 2010, in the close temporal proximity of his irrational demand, Antonucci had recommended terminating Dong to his boss Mr. Cheng-Le Zhao (“Zhao”).  Antonucci stated in his affidavit:

  > regarding Mr. Dong’s termination…I recall that, on Tuesday, March 16, 2010 at approximately 8:00, I had a teleconference with Cheng-Le Zhao. This conversation took place approximately a week following Mr. Dong’s Performance and Development Review (“PDR”) discussion[.]”

  (Appeal Doc. 11 at 17 of 54.)

- “Antonucci admitted that he recommended terminating Dong on March 16, 2010.  SA-136.”  (Appeal Doc. 11 at 25 of 54.)

- “Antonucci recommended Dong’s termination on [sic] as early as March 16, 2010 (SA-136), which was approximately five (5) months before Dong’s actual termination on August 2, 2010.”  (Appeal Doc. 11 at 26 of 54.)

- “On March 16, 2010, Antonucci recommended terminating Dong

43

(SA-136)." (Appeal Doc. 11 at 30 of 54).

Plaintiff, however, grossly mischaracterizes paragraphs 5 through 8 of "SA-136," which is the Affidavit of Jonathan Antonucci in Support of Defendants' Response to Plaintiff's April 10, 2013 Motion to Compel:

> 5.    I am also aware that Mr. Dong's April 10, 2013 motion requests additional information regarding communications I had with Cheng-Le Zhao regarding Mr. Dong's termination. As I had advised our attorneys, I do not recall having any written communications with Cheng-Le Zhao regarding Mr. Dong's termination or the events leading up thereto. I have searched my documents, including electronic documents, and have found no such documents. I remember three specific conversations with Cheng-Le Zhao and/or Detlef Ruff regarding Mr. Dong's poor work performance, all of which were oral.
>
> 6.    First, I recall that, on Tuesday, March 16, 2010 at approximately 8:00, I had a teleconference with Cheng-Le Zhao. This conversation took place approximately a week following Mr. Dong's Performance and Development Review ("PDR") discussion, and I was following up with Mr. Zhao to discuss the summary of PDRs and annual performance target agreements and foreseen issues with scientists, including Mr. Dong.
>
> 7.    Next, I recall that, on Friday, April 30, 2010, at approximately 13:30, Detlef Ruff, Cheng-Le Zhao, and I discussed Mr. Dong's performance (among others) in Mr. Ruff's office in Ludwigshafen, Germany.
>
> 8.    Finally, I recall that, on Wednesday, May 19, 2010 at 19:30, I discussed Mr. Dong's performance with Detlef Ruff at Hotel Charlotte while waiting to be seated for dinner.

44

(DE 42-12 at 17.)    Nowhere in this affidavit did Antonucci state that he recommended Plaintiff's termination in March 2010.  Indeed, there is no record evidence whatsoever to support Plaintiff's insistence that Antonucci recommended his termination in March 2010.  Regardless, it is undisputed that Plaintiff was not terminated in March 2010; rather, he was terminated in August 2010.

### E.    Plaintiff's "Comparator" Evidence Fails

Plaintiff alleges that he was treated less favorably than similarly-situated individuals (Varela and Hamilton) who were not Asian/Chinese.  (Appeal Doc. 11 at 46-48.)[19]  However, Plaintiff's "evidence" is unavailing.

In the Fourth Circuit, Plaintiff must show that he was "similarly situated with a comparator who received less severe discipline from the same supervisor for essentially the same conduct."  *Lloyd v. New Hanover Regional Medical Center*, 405 F. App'x 703, 705 (4th Cir. 2010) (citing *Lloyd v. New Hanover Regional Medical Center*, No. 7:06-cv-130-D, 2009 WL 890470 (E.D.N.C. Mar. 31, 2009)).

Luis Varela is not an appropriate comparator of Plaintiff's.  Varela, who has worked for BASF since August 23, 1999, was the principal inventor of the super all-temperature technology which is being commercially sold by BASF (and, in fact, BASF is the market leader in this technology).  (DE 61-2, Second Antonucci Aff. ¶ 5.)  Plaintiff succeeded Varela as the principal R&D Scientist on the GPP

---

[19] Varela is Hispanic; Hamilton is Caucasian.

Project. (*Id*. ¶ 6.)  While Varela was assigned the duty of supporting the GPP

Project in 2009, his duties differed from Plaintiff's, as reflected by Varela's and

Plaintiff's performance reviews for 2009.  (*Id*. ¶ 6 (noting the comparison of

Plaintiff's performance reviews attached as Exs. A, B & C to Antonucci's May 2,

2013 Affidavit (DE 43-2 at 9-27) with Varela's performance reviews attached as

Ex. 1 to Affidavit of Yan Dong (DE 56-1 at 3-14)).)  Moreover, as with Antonucci,

Varela was a stronger performer than was Plaintiff, as reflected in his performance

reviews from 2008 and 2009 from Drewery, who was also Plaintiff's supervisor

and evaluated Plaintiff's performance for the same time period.  (DE 61-2, Second

Antonucci Aff. ¶ 7; DE 43-2 at 9-18.)  Varela received a performance rating of PL-

7 for 2008 and a PL-5 rating for 2009 from Drewery, as compared to Plaintiff's

ratings of PL-5 for 2008 and PL-4 for 2009 from Drewery.  (*Id*.)  Varela also

received a much higher performance rating from Antonucci for 2010 than did

Plaintiff; Varela received a PL-5 while Plaintiff received a PL-1.  (DE 61-2,

Second Antonucci Aff. ¶ 8, Ex. C; DE 52-3 at 41-48.)[20]  Accordingly, Varela is not

_____

[20] Significantly, these were not ratings from the alleged discriminator, Antonucci. Rather, they were from Drewery who Plaintiff testified, under oath, did not discriminate against him based on his race/national origin.  Although Plaintiff later contradicted himself by testifying that Drewery did discriminate against him, such contradictory sworn statements are insufficient as a matter of law to raise a genuine issue of disputed fact. *See Cochran v. Holder*, 436 F. App'x 227, 233 (4th Cir. 2011) (plaintiff cannot create a genuine issue of material fact by pointing to contradictions in his own testimony); *Erwin v. United States,* 591 F.3d 313, 325 n.7 (4th Cir. 2010) (same).  Moreover, Plaintiff's only "evidence" of

an appropriate comparator on which Plaintiff can show that he was subject to disparate treatment based on his race/national origin.

With respect to Hamilton, Plaintiff argued before the District Court and continues to argue in his appellate brief that he was subject to disparate treatment because he was not given a PIP, while Hamilton, who reported to Antonucci, was going to be placed on a PIP but resigned. (DE 56 at 8; Appeal Doc. 11 at 27 of 54.) However, Plaintiff fails to make any showing that he and Hamilton were similarly situated – for example, Plaintiff does not even consider whether the reasoning for deciding against a PIP for him would apply to Hamilton. Rather, he simply jumps to the conclusion that Antonucci was preparing to give her a PIP because she was Caucasian. In fact, Plaintiff and Hamilton were not similarly situated. The record evidence remains undisputed that, while Plaintiff lacked fundamental scientific skills to do his job, Hamilton demonstrated a strong fundamental scientific skill set but had difficulty applying that skill set to particular tasks. Antonucci found that Hamilton was a bright and conscientious scientist who needed to show more initiative and to develop stronger leadership and project management skills. (DE 61-2, Second Antonucci Aff. ¶ 17.) Accordingly, Hamilton also is not an appropriate comparator for Plaintiff.

Plaintiff continues to insist that BASF, as well as Antonucci, has a PIP

---

discrimination by Drewery is Plaintiff's disagreement with Drewery's assessment of his performance. Such "evidence" fails as a matter of law.

policy, despite Defendants' repeated responses (and even an affidavit) in discovery that there exists no such policy.[21]  Rather, a PIP is a performance management tool which managers may use, as they deem appropriate and effective, but it is not required, nor does it make sense, in all cases.  (DE 56-1 at 31-32.)  With respect to Plaintiff, a PIP was deemed not appropriate or useful for the following reasons:

> We do not believe that his performance deficiencies should be addressed through a 90 day performance improvement plan as the success of development work is typically evaluated over an extended period of 9 months to three years.  Additionally, we feel that his performance to date represents his full capabilities with sufficient direction and guidance to have been successful.

(DE 52-4 at 3.)  For those reasons, Antonucci and Zhao concluded that it did not make business sense to put Plaintiff on a PIP because it would have required assigning Plaintiff to, and funding, another project.  (DE 43-4, Zhao Decl. ¶ 11.)

In addition, the alleged "special" performance review Hamilton received in September 2010 is simply not evidence of "pretext."  It is clear from the face of the document that Hamilton received this evaluation and review of target agreement objectives in conjunction with the transfer of supervisory responsibility of Hamilton from Antonucci to Arno Tuchbreiter.  (DE 70-3 at 24 of 61.)

---

[21] Moreover, BASF has an at-will employment policy which states that either the employee or the Company could terminate the employment relationship without notice, at any time and for any reason. (DE 43-8 & 43-9, Pl. Dep. Ex. 7.)

### F.    The District Court Did Not Abuse Its Discretion When It Denied Plaintiff's Discovery Motions

Finally, Plaintiff alleges that summary judgment was improper because he did not have "adequate time for discovery," and was wrongly denied "relevant" discovery.  (Appeal Doc. 11 at 51 of 54.)  He contends that Defendants withheld his "inventorship information" regarding the Synthetic Cold Seal Adhesive project until March 25, 2013 and that he "filed a series [sic] motions in trying to have a more adequate Discovery relative to his performance at the time of the termination. But all the requests were denied by the district court." (*Id.*)  Plaintiff's challenge to the District Court's Order denying additional discovery is reviewed for an abuse of discretion.  *See Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002).  A trial court has broad discretion in managing pretrial discovery and an appellate court should not disturb its orders absent a clear abuse of discretion.  *Ardrey v. United Parcel Serv.,* 798 F.2d 679, 682 (4th Cir. 1986).

As established below, Plaintiff's challenge to the Magistrate Judge's May 10, 2013 Order fails.  Plaintiff presents no factual or legal support for any finding that the District Court abused its discretion in denying his discovery motions.

The discovery history in this case reveals that Plaintiff's argument that he unfairly was denied discovery is without merit.  The District Court's Pretrial Order and Case Management Plan (DE 10), dated May 15, 2012, originally set the discovery deadline as November 28, 2012.  On November 21, 2012, the Court

49

granted an extension of the discovery deadline to January 28, 2013. (DE 14.) On January 25, 2013, the Court again extended the discovery deadline to March 1, 2013. (DE 20.) On February 15, 2013, the Court granted a third extension of the discovery deadline to April 15, 2013. (DE 27.)

On April 1, 2013, Plaintiff filed a motion seeking a further extension of the discovery period. (DE 37.) Plaintiff contended that, on March 25, 2013, he received a package from BASF, the contents of which indicated BASF "ha[d] been benefiting from Plaintiff's original technical invention of Cold Seal Adhesive, for years after Plaintiff was terminated," and "[w]hile Defendants have repeatedly claimed Plaintiff was a blatant 'poor' job performer, this new Package has once again indicated the contrary: Plaintiff performed his job well." (DE 37 at 2.) Notably, this motion came after a full year of discovery and three extensions of the discovery period.

Defendants filed their response in opposition to this motion on April 18, 2013. (DE 39.) In their response, Defendants provided affidavit evidence that the documents Plaintiff received were routine documents that were sent to all employees who were involved in a project that resulted in a patent filing, had no bearing on Plaintiff's termination and the instant lawsuit, and were thus not relevant. (*Id.*)

On April 10, 2013, Dong filed a motion to compel discovery.  (DE 38.)  In this motion, Plaintiff sought to compel Defendants to comply with the District Court's March 19, 2013 Discovery Order (DE 36).  Specifically, Plaintiff sought to compel Defendants to produce: 1) a copy of "'the BASF initial invention disclosure form for GPP filed by Plaintiff Yan Dong in 2009'"; 2) "'complete job performance reviews of all employees in PIP who held a similar position as Plaintiff, for at least two consecutive years prior to entering into PIP'"; and 3) to "'complete BASF performance improvement program (PIP) policy/procedure' . . . and those of 'all communications between Defendant Jonathan Anotnucci and Mr. Cheng-le Zhao, leading up to the termination decision of Plaintiff's job'".  (*Id.*)  Defendants filed their response in opposition to this motion on April 29, 2013.  (DE 42.)  In their response, Defendants demonstrated:

- They had already produced to Plaintiff the only form of document in their possession that resembled an "Invention Disclosure Form" for the GPP Project, which Plaintiff admitted in his deposition complied with his request;

- They had already responded to Plaintiff and reiterated that Defendant BASF has no formal PIP policy, procedure or program and, although not required, supplied a sworn Affidavit by Defendant Jonathan Antonucci to that effect;

- They had already responded to Plaintiff and reiterated that that there were no other employees who held a similar position to Plaintiff's who were placed on a PIP.  Notwithstanding that, Defendants provided the performance reviews for the employees who worked at the Charlotte facility who had been placed on a PIP; and

51

- They had already responded to Plaintiff and reiterated that there were no written communications between Defendant Jonathan Antonucci and Cheng-Le Zhao regarding the termination of Plaintiff's employment, and although not required, supplied a sworn Affidavit by Defendant Antonucci that all of his communications with Cheng-Le Zhao relating to Plaintiff's performance had been oral and stating when and where those oral communications took place.

(DE 42 at 5-6.)

On May 3, 2013, Defendants timely filed their motion for summary judgment. (DE 43.)

On May 7, 2013, Plaintiff filed both a motion to extend time to respond to summary judgment (DE 45), as well as another motion to compel discovery. (DE 46.) This May 7, 2013 motion to compel sought documents responsive to Plaintiff's third set of requests for production of documents; namely, documents related to the patent filing Plaintiff received on March 25, 2013. On May 10, 2013, the Magistrate Judge issued an Order denying Plaintiff's motion to extend the discovery period for a fourth time (DE 37), as well as his April 10 and May 7 Motions to Compel (DE 38 & 46). (DE 48.) In his Order, the Magistrate Judge explained:

1) With respect to Plaintiff's motion to extend the discovery deadline from April 15, 2013 to May 25, 2013: "the undersigned is not persuaded that it is necessary or appropriate to allow another extension of the discovery period in this matter. At this time, both the discovery and dispositive motions deadlines have passed, and Defendants have timely filed a '…Motion For Summary

52

Judgment' (Document No. 43). Moreover, the undersigned is not persuaded that follow-up discovery on the 'Synthetic Cold Adhesive' patent, filed December 22, 2011, is relevant to Plaintiff's allegations of discrimination in or about 2008-2010. See (Document No. 1)."

2)    With respect to Plaintiff's [Second] Motion to Compel (for Defendants to comply with the Court's March 19, 2013 Order): "Based on a careful review of the parties' briefs and attachments, the undersigned finds that Defendants have satisfied the Court's previous instructions to the best of their ability. The [Plaintiff] may suspect, or wish, that there were more responsive documents to be produced, but he has not convinced the Court that Defendants are withholding discoverable information. Moreover, Defendants' explanations for what has and what has not been produced appear reasonable. As such, the Court will decline to compel further action."

3)    With respect to Plaintiff's Third Motion to Compel: "Based on the foregoing, particularly the determination that the discovery deadline should not be extended, the undersigned will deny as moot 'Plaintiff's Motion To Compel Defendants To Produce Documents Responsive To Plaintiff's Third Document Production Request' (Document No. 46). The undersigned finds that the time for discovery has passed, and this matter is now ripe for adjudication by summary judgment and/or trial."

(DE 48.)

On May 17, 2013, Dong filed a motion to alter or amend judgment regarding the Magistrate's denial of his motions to compel. (DE 50.) This motion also was

denied on the finding that Plaintiff failed "to present any persuasive or new information that the Court's previous Order was in error." (DE 51.)

The District Court did not abuse its discretion in denying Plaintiff's motions. First, it is clear that Dong had ample opportunity for discovery. Indeed, the District Court previously had granted three extensions of the discovery period.

Second, with respect to the motions to compel, the District Court properly held that the discovery sought, e.g., information related to the Cold Seal Adhesive patent filing in 2011, would not be "relevant to Plaintiff's allegations of discrimination in or about 2008-2010". (DE 48 at 2.) Both before the District Court and in his appellate brief, Plaintiff has failed to set forth any facts or arguments demonstrating how the information sought would have created a genuine issue of material fact sufficient to overcome Defendants' summary judgment motion. *Brown v. Huntington Ingalls Inc.*, 489 F. App'x. 646, 647 (4th Cir. 2012) (plaintiff failed to show that the additional materials and information that were not considered by the district court would be appropriate). More specifically, the additional discovery sought by Plaintiff would in no way undermine the deficiencies in Plaintiff's performance on the GPP Project, his inability to produce a technical report on the GPP Project and his continued unsatisfactory work on the Acronal 3624 project. Therefore, Plaintiff has not

demonstrated that the District Court abused its discretion regarding the discovery motions at issue.

## VII.   CONCLUSION

For the reasons set forth herein, and in Defendants' summary judgment moving and reply memoranda, Defendants respectfully request that this Court affirm the District Court's July 8, 2013 Order granting summary judgment to Defendants on all claims, and also affirm the District Court's May 10, 2013 Order denying Plaintiff additional discovery.

## VIII.  STATEMENT REGARDING ORAL ARGUMENT

BASF requests that the Court dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the Court and argument will not aid the decisional process.  *See* Fed. R. App. P. 34(a)(1).

Dated this the 20th day of September, 2013.

Respectfully submitted,

s/Kelly S. Hughes
N.C. Bar No. 33439
*Attorney for Defendants-Appellees*
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
201 South College Street, Suite 2300
Charlotte, NC 28244
Telephone (704) 342-2588
Facsimile (704) 342-4379
E-mail:  kelly.hughes@ogletreedeakins.com

s/Theresa Donahue Egler
N.J. Attorney ID # 030591983

*Attorney for Defendants-Appellees*
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
10 Madison Avenue, Suite 400
Morristown, NJ  07960
Telephone: 973.656.1600
Facsimile: 973.656.1611
E-Mail: theresa.egler@ogletreedeakins.com

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

**No.** 13-1985          **Caption:** Yan Dong v. BASF Corporation

**CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)**
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [✔]    this brief contains ____13,399____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [ ]    this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [✔]    this brief has been prepared in a proportionally spaced typeface using
   Microsoft Word 2010 _____ [*identify word processing program*] in
   14-point Times New Roman _____ [*identify font size and type style*]; **or**

   [ ]    this brief has been prepared in a monospaced typeface using
   _____ [*identify word processing program*] in
   _____ [*identify font size and type style*].

(s) Kelly S. Hughes _____

Attorney for Defendants-Appellees _____

Dated: 9/20/2013 _____

## <u>CERTIFICATE OF SERVICE</u>

I, Kelly S. Hughes, hereby certify that I have this day electronically filed the foregoing **BRIEF OF DEFENDANTS-APPELLEES** with the Clerk of Court using the CM/ECF system.  I also certify that I have served a copy of the same via United States mail, properly addressed and with the correct amount of postage affixed thereon, upon the following person:

Yan Dong, Pro Se Plaintiff
203 Grimball Lane
Fort Mill, SC 29715

Dated this the 20th day of September, 2013.


<u>s/Kelly S. Hughes</u>
N.C. Bar No. 33439
*Attorney for Defendants-Appellees*
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
201 South College Street, Suite 2300
Charlotte, NC 28244
Telephone: 704.342.2588
Facsimile:  704.342.4379
E-mail:  kelly.hughes@ogletreedeakins.com